**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

_____

United States of America,

      Plaintiff,

v.

Ricky W. Mariano (01),
Benjamin J. Dolan (05),
James Edward Freeman (07),

      Defendants.

**Criminal No. 11-243 (DWF/SER)**

**REPORT AND**
**RECOMMENDATION**

_____

      Laura M. Provinzino, United States Attorney's Office, 600 U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota 55415, for Plaintiff.

      Daniel L. Gerdts, Esq. 708 North Tyrol Trail, Golden Valley, Minnesota 55416, for Defendant Ricky W. Mariano (01).

      John L. Fossum, Esq., Fossum Law Office, LLC, 516 South Water, Suite 103, Northfield, Minnesota 55057, for Defendant Benjamin J. Dolan (05).

      Kyle D. White, Esq., 332 Minnesota Street, Suite W-1710, Saint Paul, Minnesota 55101, for Defendant James Edward Freeman (07).

_____

      The above-captioned case came before the undersigned United States Magistrate Judge on October 14, 2011 on Defendant Ricky W. Mariano's (01) Motion to Suppress All Electronic Surveillance Evidence and Any Evidence Derived Therefrom [Doc. No. 155]; Motion to Suppress All Identifications of Defendant Obtained Through Unlawful Identification Procedures [Doc. No. 156]; Motion to Suppress All Evidence Obtained from Unlawful Searches and Seizures [Doc. No. 157]; and Motion to Suppress Statements Made by Defendant [Doc. No. 158]; Defendant Benjamin J. Dolan's (05) Motion to Suppress Statements, Admissions, and Answers [Doc. No. 144]; and Motion to Suppress Evidence Obtained as a Result of Search and

1

Seizure [Doc. No. 152]; Defendant James Edward Freeman's (07)'s Motion for Suppression of Statements by Defendant [Doc. No. 106]; Motion to Suppress Evidence Obtained Through Illegal Search and Seizure [Doc. No. 107]; Motion for Severance of Defendants and Counts [Doc. No. 121]; and Motion for Severance of Defendant [Doc. No. 124]. This matter has been referred to the undersigned for the resolution of pretrial matters pursuant to 28 U.S.C. § 636(b)(1)(A) and District of Minnesota Local Rule 72.1.[1]  For the reasons set forth below, the Court recommends that Defendants' motions be denied.

I.   BACKGROUND

The Government filed an Indictment against ten defendants on August 2, 2011 [Doc. No. 1]. The three count Indictment charges all Defendants with Theft of Mail Matter and Bank Fraud Conspiracy and charges Defendants Ricky W. Mariano (01) ("Mariano") and Benjamin J. Dolan (05) ("Dolan") with Destruction of Letter Boxes. At the pretrial motions hearing on October 14, 2011, Fraud Analyst John Callinan ("Analyst Callinan") testified on behalf of the Government. U.S. Postal Inspector Troy Sabby ("Sabby") testified on behalf of both the Government and Mariano. Defendant Mariano testified on his own behalf. The Court received eight exhibits into evidence: 1) Memorandum of Interview Dated 7/14/11 (Gov't Ex. 1); 2) Memorandum of Interview Dated 1/31/11 (Gov't Ex. 2); 3) Memorandum of Interview Dated 2/11/11 (Gov't Ex. 3); 4) Memorandum of Interview Dated 3/9/11 (Gov't Ex. 6); 5) Memorandum of Interview Dated 7/13/11 (Gov't Ex. 7); 6) Application for Search Warrant and Supporting Affidavit for 3275 Labore Road, Vadnais Heights, Minnesota (Gov't Ex. 8); 7) Search Warrant, Application, and Return for 3275 Labore Road, Vadnais Heights, Minnesota

---

[1] The Court has addressed Defendants' non-dispositive motions in a separate Order.

(Gov't Ex. 8A); and 8) Email Correspondence Dated 1/25/11 (Def.'s Ex. 9).[2] This matter is set for trial before United States District Judge Donovan W. Frank on November 28, 2011.

## II. FACTS

### A. Search Warrant

On January 31, 2011, Ramsey County District Court Judge Margaret M. Marrinan granted the application and signed a warrant for 3275 Labore Road, Vadnais Heights, Minnesota 55127. (Gov't Exs. 8, 8A). Both Mariano and Dolan reside at this address. (Tr. 26, 51).[3] In support of the warrant application, Inspector Sabby provided a three-page affidavit detailing information and evidence that the investigation produced. (Gov't Ex. 8, at 2-4). This information and evidence included: statements from postal employees regarding approximately twelve collection box break-ins; surveillance video and still photos showing individuals identified as Dolan and Sarrah Vail allegedly paying for merchandise and gas using stolen checks and fake identification; statements of mail theft victims; statements of Postal Inspectors observing a minivan registered to Sarrah Vail at 3275 Labore Road and Dolan entering the residence at 3275 Labore Road; and a description of the process and instrumentalities used to wash checks. (*Id*. at 2-3). Postal inspectors confirmed that both Dolan and Sarrah Vail receive mail at 3275 Labore Road. (*Id*. at 2). An email dated January 24, 2011 from a Ramsey County Sherriff's Department Investigator to U.S. Postal Inspector Bouchie ("Inspector Bouchie") states,

---

[2] Exhibits 1-2, 4-5 were admitted for the limited purpose of determining whether the interviews were non-custodial and voluntary. (Tr. 25). With the exception of Exhibit 3, these memoranda of interview contain little if any information as to the circumstances surrounding the interview and the extent to which Defendants may have been advised of their rights and are replete with hearsay.

[3] The page references cited herein are found in the Transcript of the Motions Hearing, *United States v. Mariano, et al*, (11CR243), October 19, 2011 [Doc. No. 119] ("Tr.").

3

"The suspect[4] lives [in] the upper unit with his girlfriend. The only access to the unit is from the rear." (Def.'s Ex. 9).

In the warrant application, Sabby sought permission to search for and seize: checks, checkbooks, and check carbons and registers; receipts, documents, and financial records related to check washing and demonstrating indicia of occupancy or ownership of the premises; electronics such as computers, printers, and data storage devices used to create counterfeit checks, identification, and documents; new merchandise that may have been purchased with forged checks including a 32'' Sylvania television and an Xbox 4G; and weapons and firearms. (*Id*.)

On the afternoon of January 31, approximately ten law enforcement officers including Ramsey County Deputies and U.S. Postal Inspectors executed the search warrant. (Tr. 27); (Exs. 8, 8A). Officers seized: stolen mail; forms and materials used to make fake identifications; a 32'' Sylvania television; washed checks; tools that could be used for breaking into mailboxes including bolt cutters, a socket set, and screwdrivers; datebooks containing phone numbers; and receipts from goods that may have been purchased with washed or stolen checks. (Gov't Ex. 8A, at 4-5).

The case agent, Inspector Sabby, was present for the execution of the search warrant and described the house as "disjointed" and "fairly broken-up." (Tr. 19, 27, 48). Inspector Sabby testified that the residence did not have a "good flow to it" as would a "normal house." (Tr. 49). Upon walking through the front door, the options were either to go down a staircase or turn to the left. (Tr. 49). The kitchen was accessible through a separate small walkway. (Tr. 49). The

---

[4] "The suspect" presumably refers to Mariano based on his counsel's assertions at the pretrial motions hearing. (Def's Ex. 9); (Tr. 97).

Court infers that Mariano resided in the purported lower unit with Sarrah Vail and Dolan lived in the upper unit.[5]  (Def. Dolan's Mem, at 2) [Doc. No. 207].

## B. Defendants' Statements

### 1. January 31, 2011

#### a. Mariano's Statements

When the postal inspectors arrived to execute the search warrant, Mariano was home. (Tr. 26-27, 100, 102).  He asked if he could leave to go to work and the officers said he could do so freely.  (Tr. 26-27, 100, 102).  Before departing, Mariano asked if he was being charged; officers told him that he was not.  (Tr. 100).  Mariano went to a friend's house two blocks away for approximately 20 minutes.  (Tr. 20, 28, 100, 103).  When Ramsey County Deputies arrived at Mariano's friend's house, they asked if Mariano was there and said they had several questions for Mariano.[6]  (Tr. 20, 28).

When Mariano returned with the Ramsey County Deputies, he met Inspector Sabby, with whom he consented to speak.  (Tr. 20, 28).  Inspector Sabby testified that Mariano was high, agitated, and unable to hold a conversation.  (Tr. 20).  Mariano testified that he did not recall if he was high on methamphetamine when Inspector Sabby attempted to speak with him but that he was using drugs during that period of time.  (Tr. 103).  During the brief interview, Inspector Sabby did not take any notes and asserted that Mariano did not make any statements.  (Tr. 20-21,

---

[5] A January 24, 2011 email, however, seems to imply that law enforcement believed that Mariano resided in the alleged upper portion of the house.  (Def.'s Ex. 9).

[6] Mariano testified at the pretrial motions hearing that when the Ramsey County Deputies found him, they put him in handcuffs and took him to the Ramsey County Jail.  (Tr. 101).  He was told that he was under arrest.  (Tr. 101, 103).  His testimony conflicts with Inspector Sabby's testimony that he briefly attempted to speak with Mariano at 3275 Labore Road after the Deputies retrieved him.  (Tr. 101, 104).  Because Mariano did not make any statements of any significance and because Mariano does not seek to suppress any statements made on January 31, 2011, the lack of clarity on this point does not affect the Court's analysis.  (Tr. 104); (Def. Mariano's Mem., at 4) [Doc. No. 206].

5

28-29). Mariano also spoke with Inspector Bouchie, who did not take notes.[7] (Tr. 29). Mariano neither invoked his right to remain silent nor asked to speak to an attorney. (Tr. 21). Though Inspector Sabby did not recall how the conversation ended, he testified that if Mariano had requested counsel, he would have ended the interview. (Tr. 29-30).

Mariano was advised of his *Miranda* rights before he was placed in a squad car for transport to the Ramsey County Jail.[8] (Tr. 105-107). Mariano acknowledged that officers advised him of his right to remain silent and his right to counsel. (Tr. 105-106). Mariano testified that he had three separate interviews the day following his arrest, presumably February 1, 2011. (Tr. 101, 107-08). Mariano was not advised of his *Miranda* rights at the beginning of each interview, but nevertheless, he acknowledged understanding his *Miranda* rights at that time. (Tr. 108-09). He described the interviews, conducted by several different interviewers,[9] as short and consisting primarily of questions about other individuals. (Tr. 101, 104). Mariano testified that when he invoked his right to counsel, saying that he did not want to answer any further questions without an attorney present, the interviews ended.[10] (Tr. 102, 108-09). After the

---

[7] Mariano testified that he had contact with a Ramsey County Deputy that was assisting with the execution of the search warrant when he was handcuffed. The Court is not certain whether Mariano was referring to the handcuffing or whether he recalled speaking to a Deputy rather than Inspector Sabby. (Tr. 103). This factual obscurity is not important, however, because Mariano did not make any statements on January 31, 2011. (Tr. 103).

[8] In an effort to explain the circumstances surrounding Mariano's January 31, 2011 arrest, the Government submitted a Memorandum of Interview prepared by Inspector Sabby after the October 14, 2011 motions hearing. [Doc. No. 213-1]. Such a submission is inappropriate and will not be considered. If the Government wanted the facts contained in the Memorandum in the Record, then it should have offered testimony at the hearing.

[9] Mariano did not recall if Inspector Sabby interviewed him the day following his arrest. (Tr. 104-105). Inspector Sabby did not testify as to whether he interviewed Mariano on February 1, 2011.

[10] The Court is uncertain to which interview Mariano's statement refers. Nonetheless, Mariano testified that he invoked his right to remain silent the day after he was advised of his *Miranda* rights. (Tr. 106).

interviews, Mariano was returned to his cell; he was released the next day and told charges of mail theft were pending. (Tr. 102).

### b. Dolan's Statements

Dolan was not present for the execution of the search warrant because he was plowing snow. (Tr. 38). Officers obtained Dolan's cell phone number and called him to ask if he was willing to talk to law enforcement. (Tr. 38). Dolan said that he was willing to talk with officers, but it would need to be later in the day after he was off work. (Tr. 39). Dolan suggested that they meet at a White Bear Lake cafe. (Tr. 39).

Inspectors Sabby and Bouchie met Dolan at approximately 6:15 p.m. at the cafe. (Tr. 39-40, 50). Dolan was not advised of his *Miranda* rights, yet Inspector Sabby told him that he was free to leave at any time and that he was there on his own free will.[11] (Tr. 39). Other customers were present in the cafe during the interview. (Tr. 39-40). Inspectors Sabby and Bouchie were wearing casual clothes and did not make any threats. (Tr. 40). Dolan was told he was not and would not be placed under arrest. (Tr. 40). Dolan was not told, however, that his statements might be used against him. (Tr. 48).

Inspector Sabby testified that he or Inspector Bouchie encouraged Dolan to speak with them and advised Dolan that it could be beneficial if he cooperated. (Tr. 47). Dolan mentioned that he might know the location of several additional items identified in the search warrant. (Tr. 40-41). Dolan agreed to take Inspectors Sabby and Bouchie back to his residence. (Tr. 40). The interview concluded when Inspectors Sabby and Bouchie finished asking Dolan questions; all three men mutually agreed to leave. (Tr. 40).

---

[11] Inspector Sabby did not record in his Memorandum of Interview that he told Dolan he was free to leave at any time. (Tr. 46-47); (Gov't Ex. 2). The interview at the cafe was not recorded. (Tr. 47).

Inspectors Sabby and Bouchie followed Dolan back to 3275 Labore Road, where they continued to converse with Dolan. (Tr. 40, 51). Dolan was not advised that anything he said or provided to the Inspectors could be used against him. (Tr. 51). Inspector Sabby recorded several of the items Dolan gave him on the return of the warrant. (Tr. 52).

### 2. Dolan's Statements on February 11, 2011

On the morning February 11, 2011, Dolan voluntarily came to the Minneapolis Central Post Office for an interview with Inspectors Hayden and Bouchie and Analyst Callinan.[12] (Tr. 44). A phone call from Dolan prompted the interview. (Tr. 54, 60). At the beginning of the unrecorded interview, Dolan was informed that he was not under arrest, was free to leave at any time and end the interview, and was not going to be arrested at the conclusion of the interview. (Tr. 44-45, 53, 62); (Gov't Ex. 3, at 1). Dolan was free to move about and no threats or promises were made. (Tr. 44, 60-61). Analyst Callinan and Inspector Bouchie conducted most of the questioning. (Tr. 59). Analyst Callinan testified that the interview atmosphere was not police-dominated. (Tr. 61). None of the interviewers were in uniform. (Tr. 61). If Inspector Bouchie had a gun, it was not displayed. (Tr. 61-62).

The interview's purpose was to obtain additional facts relevant to the investigation. (Tr. 60). Agent Callinan testified that Dolan was told that it would be helpful if he were cooperative and that it could be beneficial to Dolan in terms of future negotiations with the Government if he accepted responsibility for what he had done. (Tr. 60, 67-68). Analyst Callinan did not make any promises to Dolan regarding charges he may be facing but said that they could bring Dolan's

---

[12] Analyst Callinan is a retired Postal Inspect rehired five years ago to conduct fraud investigations. (Tr. 58). He was involved with several interviews in connection with this case and with the execution of the search warrant on January 31, 2011. (Tr. 58).

8

cooperation to the prosecutor's attention. (Tr. 61, 67). According to Analyst Callinan, their only objective was to conduct a voluntary interview with Dolan, not to arrest Dolan. (Tr. 62).

### 3. Mariano's Statements on July 14, 2011

On July 14, 2011, Inspector Sabby knew that Mariano would be at the Ramsey County Courthouse for a hearing involving his girlfriend, Sarrah Vail. (Tr. 21). Inspector Sabby was aware that Mariano had previous felony convictions and suspected Mariano of mail fraud. (Tr. 23, 31). Mariano was seated in the courtroom audience when a courtroom deputy approached him and said Inspector Sabby wanted to speak with him and Sarrah Vail. (Tr. 33, 36). Inspector Sabby interviewed Sarrah Vail first. (Tr. 33, 36).

Inspector Sabby, Analyst Callinan, and a courtroom deputy were present for Mariano's interview, which took place in an attorney-client interview room in a hallway adjacent to the courtroom. (Tr. 23). Inspectors Sabby and Callinan were inside the room when Mariano entered; Inspector Sabby closed the door. (Tr. 33-34). Mariano was seated facing the door and was free to move about the room. (Tr. 23). Inspector Sabby was seated across from Analyst Callinan; Mariano was seated at the head of the table facing the door. (Tr. 35-36). Inspector Sabby told Mariano that he was free to leave; no threats were made. (Tr. 23). Inspector Sabby testified that he was likely wearing cargo pants and an untucked shirt covering his waistline rather than a uniform and that he thought Mariano knew that he was a postal inspector. (Tr. 34, 37). Inspector Sabby did not recall if he had his gun during the interview; if he did have a gun, then it would have been concealed. (Tr. 34-35). Analyst Callinan did not have a gun. (Tr. 35). Inspector Sabby did not know if the courtroom deputy had a gun. (Tr. 32, 34).

Inspector Sabby and Analyst Callinan shook Mariano's hand. (Tr. 34). Before asking any questions, Inspector Sabby told Mariano that he was free to leave at any time, was not under

9

arrest, and would not be arrested at the conclusion of the interview. (Tr. 22, 36). Inspector Sabby did not advise Mariano of his *Miranda* rights. (Tr. 36). Mariano agreed to speak and made incriminating statements. (Gov't Ex. 1); (Tr. 23-24). Inspector Sabby ended the interview when Mariano said he did not feel comfortable making any additional statements. (Tr. 25, 37). Inspector Sabby and Mariano shook hands and Mariano walked out the door. (Tr. 37).

### III. DISCUSSION

#### A. The Search Warrant Was Supported by Probable Cause.

Defendants Mariano and Dolan challenge the search warrant on the grounds that the address described in the warrant, 3275 Labore Road, Vadnais Heights, Minnesota 55127 contains two units—not one—and is not supported by probable cause. As evidence that officers knew the residence was a duplex, Mariano cites a January 24, 2011 email from a Ramsey County Sherriff's Department Investigator to Postal Inspector Bouchie ("Bouchie") stating, "The suspect lives [in] the upper unit with his girlfriend. The only access to the unit is from the rear." (Def.'s Ex. 9). None of the defendants made a *Franks* challenge to the warrant nor submitted an affidavit challenging its sufficiency. (Tr. 91-93). In fact, counsel for both Dolan and Mariano consented to submitting the warrant on the four corners and stated that the issue of whether the house had two units pertained to the scope of the warrant rather than a *Franks* challenge. (Tr. 6, 49-50, 92). A four corners evaluation is, therefore, appropriate.

In a four corners analysis, the court must make a probable cause determination based only on information found within the four corners of the affidavit supporting the warrant. *United States v. Hudspeth*, 525 F.3d 667, 674 (8th Cir. 2008); *United States v. Olvey*, 437 F.3d 804, 807 (8th Cir. 2006). "If an affidavit in support of a search warrant sets forth sufficient facts to lead a prudent person to believe that there is a fair probability that contraband or evidence of a crime

10

will be found in a particular place, probable cause to issue the warrant has been established." *Hudspeth*, 525 F.3d at 674 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Wyoming v. Houghton*, 526 U.S. 295, 302 (1999) (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978)). The affidavit and application must also establish a nexus between the items to be seized and criminal behavior. *Warden v. Hayden*, 387 U.S. 294, 306-07 (1967).

A court "may properly rely on normal inferences drawn by the surrounding circumstances and the allegations of facts contained in the affidavit." *United States v. Carlson*, 697 F.2d 231, 238 (8th Cir. 1983); *see United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000). Likewise, officers may make reasonable inferences when preparing affidavits in support of a warrant. *Thompson*, 210 F.3d at 860. Even if a search warrant is not supported by probable cause, a court may deny a suppression motion if the good-faith exception applies. Under the good-faith exception to the exclusionary rule, "evidence seized pursuant to a search warrant. . . that is later determined to be invalid, will not be suppressed if the executing officer's reliance upon the warrant was objectively reasonable." *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007); *United States v. Ross*, 487 F.3d 1120, 1122 (8th Cir. 2007) (citing *United States v. Leon*, 468 U.S. 897, 923 (1984)). The *Leon* good-faith exception is lost, however, when an officer relies on a warrant for which the supporting affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923; *see Ross*, 487 F.3d at 1122.

The search warrant was sufficiently particularized to establish probable cause to search the entire residence at 3275 Labore Road in Vadnais Heights.[13] Inspector Sabby's affidavit contained specific, articulable facts linking Dolan and Mariano's live-in girlfriend, Sarrah Vail, to the property including surveillance video footage and still photos of individuals matching Sarrah Vail and Dolan's descriptions buying items using fake identification and stolen checks. (Gov't Ex. 8, at 2-3). The affidavit also contained statements of Postal Inspectors who observed Sarrah Vail and Dolan entering and leaving the residence. (*Id*.). Postal inspectors confirmed that Dolan and Sarrah Vail received mail at 3275 Labore Road. (*Id*. at 2). As such, sufficient probable cause supported the search warrant in the totality of the circumstances. Aside from a passing reference in a January 2011 email, no facts support the Defendants' contention that 3275 Labore Road was a duplex and the warrant was not sufficiently particularized.

Assuming, *arguendo*, that the house was a duplex, the warrant would have applied to the entire residence because the individuals named in the warrant lived on separate purported units. The warrant names both Sarrah Vail (residing in the lower level with Mariano) and Dolan (residing in the upper level). (Def. Dolan's Mem. at 2). Given that inspectors had adequate probable cause to suspect both Sarrah Vail and Dolan of engaging in criminal activity, the warrant applied to the entire property.

Even if Inspector Sabby's affidavit did not provide sufficient probable cause to search the entire property at 3275 Labore Road, the executing officers' reliance on the warrant was objectively reasonable under *Leon*. 468 U.S. at 923. Inspector Sabby's three-page affidavit provided extensive evidence of check washing and check fraud. (Gov't Ex. 8). The affidavit also detailed significant evidence of Dolan and Sarrah Vail's criminal enterprise supporting the

---

[13] Whether the zip code for the property was incorrect is immaterial because the residence is described with ample particularity. (Tr. 96).

allegation that they acted in concert with other parties to engage in check theft, fraud, and washing. *Id*. Given the logical inference that an individual engaged in check washing would have evidence or proceeds of such activity in his residence, the inspectors' reliance on the warrant was reasonable. The affidavit and warrant were not "so lacking in indicia of probable cause" as to make it "entirely unreasonable" for officers to rely on the warrant. *Leon*, 468 U.S. at 923; *see Ross*, 487 F.3d at 1122.

The scope of the probable cause supporting the warrant extended to the basement laundry room where Mariano's blue bag was found. The Court lacks adequate information as to the layout of the residence to determine whether the laundry room was a common area in which Mariano may not have a reasonable expectation of privacy. Regardless, it was objectively reasonable for officers to search the basement for contraband because the warrant logically extended to areas adjacent to the Defendants' living quarters within the residence. *See United States v. McCaster*, 193 F.3d 930, 933 (8th Cir. 1999); *see also United States v. Thomas*, 2008 WL 4542945. at *6 (D. Minn. Oct. 8, 2008) ("Even if the warrant at issue here did not technically cover the full area of the search, the officers' search of a stairwell leading to a shared basement—all enclosed within the duplex where the search occurred—was at least as reasonable as the search in *McCaster*). Thus, it was reasonable for the officers to believe that the basement fell within the warrant's scope. Accordingly, both motions to suppress evidence should be denied in their entirety.

### B. Defendants' Statements Should Not be Suppressed.

The contested interviews were non-custodial, consensual, and voluntary. A law enforcement officer must advise a person of his *Miranda* rights before interrogating a suspect in a custodial setting. *Miranda v. Arizona,* 384 U.S. 436, 444 (1966); *Illinois v. Perkins*, 496 U.S.

292, 297 (1992). *Miranda* defines custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *United States v. Hogan*, 539 F.3d 916, 921 (8th Cir. 2008) (citing *Miranda*, 384 U.S. at 444). An interrogation includes either express questioning or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response. *Id.*; *United States v. Howard*, 532 F.3d 755, 762 (8th Cir. 2008); *United States v. Torres-Lona*, 491 F.3d 750, 757 (8th Cir. 2007). The "determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994).

The Eighth Circuit identified several non-exhaustive "indicia of custody" to aid courts in determining whether a *Miranda* warning was required:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990); *see United States v. Flores-Sandoval*, 474 F.3d 1142, 1146-47 (8th Cir. 2007).

Whether consent is voluntary or the result of duress or coercion is a question of fact determined from the totality of the circumstances. *United States v. Watters*, 572 F.3d 479, 483 (8th Cir. 2009) (citing *United States v. Perry*, 437 F.3d 782, 785 (8th Cir. 2006)). In the

14

Eighth Circuit, the test to determine if a defendant's confession was voluntary is whether police violence, threats, or direct or implied promises overbore the defendant's will or "critically impaired" his or her "self-determination." *United States v. Kilgore*, 58 F.3d 350, 353 (8th Cir. 1995) (internal quotations omitted).

**1. Dolan's Statements Should Not be Suppressed.**

  **a. January 31, 2011 Statements at Cafe**

Dolan's interview at the White Bear Lake cafe was non-custodial. At the beginning of the interview, Dolan was advised he could leave at any time and that his cooperation was voluntary. (Tr. 39-40). Dolan agreed to talk with Postal Inspectors and suggested their meeting location, demonstrating that Dolan had freedom of movement. (Tr. 38-39). No facts support the use of strong arm or deceptive police tactics or a police-dominated atmosphere, particularly given that Inspectors Sabby and Bouchie were plain clothed and made no threats. (Tr. 40). Dolan and Inspectors Sabby and Bouchie agreed mutually to end the interview and left together; Dolan was not arrested at the conclusion of the interview. (Tr. 40). As such, a *Miranda* warning was not required. *See Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990).

Dolan's statements made during the January 31, 2011 interview were voluntary in the totality of the circumstances. *See Watters*, 572 F.3d at 483; *Perry*, 437 F.3d at 785. Though he was not informed of his *Miranda* rights and was not told that his statements could be used against him, Inspectors did not make physical or verbal threats. (Tr. 39-40). The fact that Dolan was told that his cooperation could be beneficial to him was not a promise and did not overbear his free will. (Tr. 40); *see Kilgore*, 58 F.3d at 353; *see also Simmons v. Bowersox*, 235 F.3d 1124, 1132-33 (8th Cir. 2001) (explaining officers' statement that telling the truth would make the proceedings "go better for him" was not an implied promise or improper coercion); *Bolder v.*

15

*Armontrout*, 921 F.2d 1359, 1366 (8th Cir. 1990) (holding confession voluntary though police told defendant that being truthful "'would be better for him'") (internal citation omitted). Dolan's non-custodial statements were voluntary and should not be suppressed. *See Watters*, 572 F.3d at 483; *Perry*, 437 F.3d at 785.

### b. February 11, 2011 Interview at Post Office

Dolan's statements made at the Minneapolis Central Post Office were also voluntary and made in a non-custodial setting; a *Miranda* warning was not required. Dolan voluntarily agreed to come to the Minneapolis Central Post Office for an interview. (Tr. 44). Before any questions were asked, Dolan was informed that he was not under arrest, was free to leave at any time and end the interview, and was not going to be arrested at the conclusion of the interview. (Tr. 44-45, 53, 62); (Gov't Ex. 3, at 1). Dolan was free to move about and no threats were made. (Tr. 44, 60-61). The interview atmosphere was not police-dominated; none of the interviewers were in uniform and no guns were visible. (Tr. 61-62). Agent Callinan's statement to Dolan that it could be beneficial down the road if he cooperated was not an implied promise overbearing his free will. (Tr. 60, 67-68). *See Kilgore*, 58 F.3d at 353; *Simmons*, 235 F.3d at 1132-33; *Bolder*, 921 F.2d at 1366. As such, Dolan's voluntary statements were non-custodial should not be suppressed. *See Griffin*, 922 F.2d at 1349; *see also Watters*, 572 F.3d at 483; *Perry*, 437 F.3d at 785.

### 2. Mariano's Statements Should not be Suppressed.

### a. July 14, 2011 Statements at Ramsey County Courthouse

Mariano's argues that his invocation of *Miranda* on January 31, 2011 and February 1, 2011 and the *unMirandized* statements he purportedly made to Inspector Sabby on January 31, 2011 tainted the July 14, 2011 interview. Mariano was not in custody when he spoke with Postal

16

Inspectors at the Ramsey County Courthouse on July 14. Inspector Sabby told Mariano he was not under arrest, was free to leave at any time and end the interview, and was not going to be arrested at the conclusion of the interview. (Tr. 22). Mariano had freedom of movement. (Tr. 23). Though Mariano did not initiate the contact, he voluntarily agreed to accompany the court deputy and speak with Inspector Sabby. (Tr. 33, 36). The inspectors were not in uniform; if guns were present, they were concealed. (Tr. 32, 34-35, 37). Mariano exercised his right to end the interview, shook Sabby's hand, and left on his own free will. (Tr. 25, 37). A *Miranda* warning was not required for this non-custodial interview. *See Griffin*, 922 F.2d at 1349. No evidence that promises or physical or verbal threats were made was offered. (Tr. 23). Despite the proximity to the court room and the court deputy, the atmosphere was not so police-dominated as to overbear Mariano's free will. *See Kilgore*, 58 F.3d at 353. Mariano participated voluntarily in a lawful non-custodial interview. *Watters*, 572 F.3d at 483; *Perry*, 437 F.3d at 785.

Significantly, Mariano was not in custody during the five and a half months that elapsed between his February 1, 2011 invocation of *Miranda* and the July 14, 2011 interview. *See United States v. Harris*, 221 F.3d 1048, 1052 (8th Cir. 2000). Mariano's reliance on *Edwards v. Arizona*, 451 U.S. 477, 486-87 (1981) is misplaced given that the *Edwards* defendant was in custody during the day between the two interviews at issue. Here, in contrast, 163 days elapsed. Most importantly, Mariano did not make any statements of any significance on January 31, 2011 before he was advised of his *Miranda* rights. (Tr. 105-107). Mariano's July 14, 2011 statements need not be suppressed.

### C. Mariano's Additional Motions to Suppress

At the pretrial motions hearing, the Government stated that it did not plan to introduce any evidence from line-ups or from electronic surveillance. (Tr. 9-12, 18). Both parties agreed that these motions were no longer contested and should be denied as moot. (*Id*.).

### D. Defendant Freeman's Motions

Freeman waived an appearance at the pretrial motions hearing and has not made any arguments in support of his motion for severance of defendants or his motion to sever counts. As such, his motions should be denied. Similarly, Freeman did not specify what statements or evidence he seeks to suppress. His motion apparently applies to statements he made at the White Bear Lake Police Department on August 3, 2011 after being advised of his *Miranda* rights. (Gov't Resp. to Defs.' Motions) [Doc. No. 189, at 9-10 n.5]. Presumably, Freeman's motion to suppress evidence applies to two cell phones officers seized but did not search when Freeman was arrested at his home in White Bear Lake. *Id*. The Government stated that it does not intend to use the phones as evidence. *Id*. Because Freeman has not provided any particularized arguments in support of his suppression motions, his motions should be denied.

## IV. RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein **IT IS HEREBY RECOMMENDED** that:

1. Defendant Ricky W. Mariano's (01) Motion to Suppress All Electronic Surveillance Evidence and Any Evidence Derived Therefrom [Doc. No. 155] be **DENIED as moot**;

2. Defendant Ricky W. Mariano's (01) Motion to Suppress All Identifications of Defendant Obtained Through Unlawful Identification Procedures [Doc. No. 156] be **DENIED as moot**;

3. Defendant Ricky W. Mariano's (01) Motion to Suppress All Evidence Obtained from Unlawful Searches and Seizures [Doc. No. 157] be **DENIED**;

4. Defendant Ricky W. Mariano's (01) Motion to Suppress Statements Made by Defendant [Doc. No. 158] be **DENIED**;

5. Benjamin J. Dolan's (05) Motion to Suppress Statements, Admissions, and Answers [Doc. No. 144] be **DENIED**;

6. Benjamin J. Dolan's (05) Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 152] be **DENIED**;

7. Defendant James Edward Freeman's (07)'s Motion for Suppression of Statements by Defendant [Doc. No. 106] be **DENIED**;

8. Defendant James Edward Freeman's (07)'s Motion to Suppress Evidence Obtained Through Illegal Search and Seizure [Doc. No. 107] be **DENIED**;

9. Defendant James Edward Freeman's (07)'s Motion for Severance of Defendants and Counts [Doc. No. 121] is **DENIED;** and

10. Defendant James Edward Freeman's (07)'s Motion for Severance of Defendant [Doc. No. 124] is **DENIED**.

Dated: November 22, 2011

*s/ Steven E. Rau*_____
STEVEN E. RAU
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **December 6, 2011**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.